IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| INTERCEPT PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. _____ |
| | ) | |
| STEFANO FIORUCCI, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Intercept Pharmaceuticals, Inc. ("Intercept") files this Complaint against Defendant Stefano Fiorucci ("Defendant") and, in support thereof, alleges as follows:

## NATURE OF THE ACTION

1.       This is a civil action brought to resolve inventorship of certain of Intercept's patent rights and for breach of contract.

2.       Defendant voluntarily disposed of his stock before Intercept's stock price skyrocketed.  Now, disappointed for missing out on Intercept's success, Defendant has made various unfounded threats alleging co-inventorship of certain patents held by Intercept in an attempt to extort a baseless monetary payment and has further failed to comply with his contractual obligations.

## PARTIES

3.       Intercept Pharmaceuticals, Inc. is a corporation organized and existing under the laws of Delaware with its corporate headquarters at 450 W 15th Street, Suite 505, New York, NY 10011.

4.      Upon information and belief, Defendant Stefano Fiorucci is a citizen of Perugia, Italy.  Defendant is also a co-founder of Intercept and was the owner of an aggregate of 425,000 shares of Intercept common stock (the "Founder Shares") prior to February 2009, when he voluntarily sold his shares to a third-party investor for an aggregate price of $582,250.[1]

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338(a), 35 U.S.C. § 256, the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, supplemental jurisdiction under 28 U.S.C. § 1367, and diversity jurisdiction under 28 U.S.C. § 1367.

6.      This Court has personal jurisdiction over Defendant pursuant to Federal Rule of Civil Procedure 4(k)(2) because, among other reasons, he has purposely availed himself of the benefits and protections of the laws of the United States by threatening to bring an action in the United States for correction of inventorship (which is governed by 35 U.S.C. § 256).

7.      Venue is proper in this District under 28 U.S.C. §§ 1391(b).

---

[1]     On September 26, 2012, a one-for-5.7778 reverse stock split was effectuated in conjunction with Intercept's initial public offering. The 425,000 pre-IPO shares would be equivalent to 73,557 post-IPO shares, after giving effect to the reverse stock split.

## FACTS APPLICABLE TO ALL COUNTS

### Intercept

8.      Intercept is a biopharmaceutical company focused on the development and commercialization of novel therapeutics to treat chronic liver and intestinal diseases utilizing proprietary bile acid chemistry.

9.      From 2002 to 2008, Defendant collaborated with Intercept under a series of sponsored research agreements and consulting agreements, which set forth the scope of research he was to perform, as well as the rights and obligations of the parties.

10.     Under the agreements, Defendant was engaged to characterize the pharmacokinetics, pharmacodynamics, and toxicology properties, among others, of several of Intercept's preexisting therapeutic target molecules.

### The Sponsored Research Agreements and Consulting Agreements for Intercept Projects

11.     Intercept and Defendant are parties to a first Sponsored Research Agreement that has an effective date of October 24, 2002, and was amended on February 12, 2003 and further amended on September 5, 2003 (the "2002 SRA").

12.     Intercept and Defendant are parties to a second Sponsored Research Agreement, which superseded the 2002 SRA, and has an effective date of January 1, 2005 (the "2005 SRA").

13.     Intercept and Defendant are parties to a third Sponsored Research Agreement, which superseded the 2005 SRA, and has an effective date of July 1, 2006 (the "2006 SRA").

14.     The 2006 SRA was terminated on April 2, 2008, at the mutual request of Intercept and Defendant (the "Termination Agreement").

15.     Under the terms of the 2002 SRA, 2005 SRA, and 2006 SRA (collectively, the "SRAs"), Defendant was required to "promptly and fully disclose to [Intercept] in writing any invention conceived and/or reduced to practice . . . in the conduct of the Research Project."

16.     Also, pursuant to the terms of the SRAs, Defendant assigned to Intercept all interests in any intellectual property, including patents, related to his research under the SRAs.

17.     Defendant's assignment of any patent rights arising under the SRA is unequivocal. For example, the terms of the 2006 SRA states that "[Defendant] hereby assign[s] to [Intercept] all rights title and interest in and to all Research Project Patent Rights and Research Project Technology upon creation, each such assignment to be effective as of the date of creation."

18.     Defendant also assigned all prospective patent rights to Intercept under the 2002 SRA and 2005 SRA, which both have the same assignment term as the 2006 SRA.

19.     The Termination Agreement imposed several obligations upon Defendant, including the return of any proprietary Intercept materials that were in Defendant's possession to Intercept by April 30, 2008, to provide 14 days advance notice of any proposed publication that arose from the research performed under the SRAs, and to provide "continued assistance" that included an express obligation to "provide all reasonable and timely assistance to [Intercept] in facilitating its efforts to perfect the

assignment, prosecution and maintenance of any of [Intercept's] patents or patent applications based on" the technology arising out of the research agreements.

20.     Intercept and Defendant also entered into a series of consulting agreements (the "CAs"), in which Defendant was retained as a Consultant to serve as Chairman of the Scientific Advisory Board and acting as the Company's Vice President of Research, as well as to perform consulting and advisory services within a specific "Field of Interest," and the terms of the CAs mirrored those of the SRAs.

21.     Intercept and Defendant are parties to a Consulting Agreement, having an effective date of October 14, 2002 ("CA of October 14, 2002");

22.     Intercept and Defendant are parties to an Amended and Restated Consulting Agreement, having an effective date of July 1, 2003 ("CA of July 1, 2003");

23.     Intercept and Defendant are parties to a Consulting Agreement, having an effective date of January 1, 2005 ("CA of January 1, 2005")

24.     Intercept and Defendant are parties to an Amended and Restated Consulting Agreement, having an effective date of July 1, 2006 ("CA of July 1, 2006")

25.     The CA of July 1, 2006 was terminated on November 28, 2007 in a letter agreement sent by Mark Pruzanski (the "Termination Letter").

26.     The CAs require Defendant to provide a draft of any proposed publications before submission for publication.  For example, Article 2.4 of the CA of January 1, 2005 states that "[c]onsultant will furnish Company with a copy of any proposed publication concerning any aspect of the Field of Interest in advance of its submission for publication."

27.     The CAs also make clear that any inventions are owned by Intercept.  For example, Article 4.1(a) of the CA of January 1, 2005 defines the scope of Intercept's ownership interest as "[a]ll new chemical entities, inventions, discoveries, data, innovations and improvements (whether or not patentable . . . ) related to the Field of Interest which are made, conceived, reduced to practice, created, written, designed or developed by Consultant, solely or jointly with others…during the term of this Agreement or thereafter if resulting or directly derived from Materials . . . or Proprietary Information (collectively the "Inventions") . . . shall become the sole and exclusive property of the Company."

28.     Moreover, under the CAs, Defendant agreed that "all Inventions and any and all related patents, trademarks, trade names, and other industrial and intellectual property rights and applications therefor . . . ." would be owned by Intercept, and Defendant was to "execute such further assignments, documents and other instruments as may be necessary or desirable to fully and completely assign all Inventions to the Company and to assist the Company in applying for, obtaining and enforcing patents or copyrights or other rights . . . ."

29.     Through the CAs, Defendant also "waive[d] all claims to moral rights in any Inventions."

30.     Under the CAs, Defendant was also required to disclose and protect Intercept's ownership interest of any Inventions, such as, for example, under Article 4.1(b) of the CA of January 1, 2005, which required Defendant to "promptly disclose to the Company all Inventions and will maintain adequate and current written records . . . to

document the conception and/or first actual reduction to practice of any Invention.  Such written records shall be available to and remain the sole property of the Company at all times.  Consultant will further make all reasonable diligent efforts to protect Inventions prioritized by the Company by drafting, filing and assigning all related patents."

31.     The CAs also provided Intercept with a right of first negotiation to Inventions outside the Field of Interest.  For example, Article 4.1(d) of the CA of January 1, 2005 grants Intercept "a right of first negotiation with Consultant for additional valuable consideration to secure the assignment or licensing of Inventions outside the scope of the Field of Interest but relating to novel ligands designed, synthesized and/or developed by Consultant for other targets. Upon Consultant's disclosure to Company of any such Invention, Company shall have thirty (30) days in which to engage in good faith negotiation of terms with Consultant."

32.     The CAs also prohibited Defendant from using any Intercept proprietary information or materials for his own benefit or for the benefit of third parties.  For example, under Article 4.2(a) of the CA of January 1, 2005, Defendant agreed that he would not, "during the Term or at any time thereafter, disclose to others, or use for his benefit or the benefit of others, any Proprietary Information, Materials or Invention."

33.     The CAs also obligated Defendant to return to Intercept any materials (including any quantities of proprietary Intercept compounds) at the end of the CAs.  For example, Article 4.2(d) of the CA of January 1, 2005 states that upon termination of this Agreement by Intercept for cause, "upon Company request Consultant shall promptly deliver to the Company all Materials, records, files, memoranda, notes, designs, data,

reports, price lists, customer lists, drawings, plans, computer programs, software, software documentation, sketches, laboratory and research notebooks and other documents (and all copies or reproductions of such materials) relating to the business of the Company."

34.     The CA of July 1, 2006 was terminated by a letter from Mark Pruzanski dated November 28, 2007.  Under the Termination Letter, all provisions of the CA of July 1, 2006 were terminated, with the exception of Article 2.4 ("Publications"), Article 4 ("Confidentiality and Inventions"), Article 7.1 ("Independent Contractor and Indemnification") and Article 7.7 ("Rights of Publicity").

### The Intercept-Pellicciari-Fiorucci-Pruzanski Patents

35.     Intercept is the rightful owner of the entire right, title, and interest in several patent families that name Mark Pruzanski, Roberto Pellicciari, and Defendant as co-inventors (the "Intercept-Pellicciari-Fiorucci-Pruzanski patents"), including patents and patent applications that entered national phase in numerous countries based on PCT/US2007/003678.  To date, three patents have been issued in the United States from these patent families, and several patent applications remain pending in the U.S. and worldwide.

36.     Intercept is the rightful owner of the entire right, title, and interest in U.S. Patent No. 8,546,365 ("the '365 patent"), which is entitled "Bile acid derivatives as FXR ligands for the prevention or treatment of FXR-mediated diseases or conditions."

37.     Intercept is the rightful owner of the entire right, title, and interest in U.S. Patent No. 7,932,244 ("the '244 patent"), which is entitled "Bile acid derivatives as FXR ligands for the prevention or treatment of FXR-mediated diseases or conditions."

38.     Intercept is the rightful owner of the entire right, title, and interest in U.S. Patent No. 7,858,608 ("the '608 patent"), which is entitled "Bile acid derivatives as FXR ligands for the prevention or treatment of FXR-mediated diseases or conditions."

39.     Intercept is the rightful owner of the Intercept-Pellicciari-Fiorucci-Pruzanski patents through assignment from the co-inventors, including Defendant.

**The Intercept-Pellicciari Patents**

40.     Intercept is also the rightful owner of several patent families that name Dr. Roberto Pellicciari as the sole inventor because he solely conceived the claimed inventions therein (the "Intercept-Pellicciari patents").

41.     The Intercept-Pellicciari patents are published as PCT patent applications WO 2008/091540, WO 2010/014836, WO 2010/059853 and WO 2010/059859, and there are corresponding U.S. and European Patent Office (EPO) counterparts to each of these PCT patent applications.   Intercept is the rightful owner of the entire right, title, and interest in each of the Intercept-Pellicciari patents, such as, for example, U.S. Patent Nos. 8,410,083, 8,114,862, and 8,445,472, through assignment by the properly named inventor, Dr. Pellicciari.  These patent families pertain to proprietary Intercept compounds known as "INT-777", "UPF-887", "UPF-1212", "UPF-1213", and "UPF-1244".

**Defendant's Payment under the SRAs and CAs**

42.     Pursuant to the terms of the SRAs and CAs, Intercept paid Defendant in the form of research support and direct cash payments.

43.     Intercept further awarded Defendant options to purchase 34,615 shares of Intercept's common stock at a price of $9.8223 per share on July 1, 2006.  All such options

to purchase common stock expired upon the termination of Defendant's consulting arrangement with Intercept in 2007.[2]

<h3 style="text-align:center"><u>Intercept Becomes Very Successful</u></h3>

44.    On or around January 9, 2014, after Defendant had already disposed of his Founder Shares, Intercept, a publicly traded company, announced the successful results of clinical trials on obeticholic acid (OCA), a novel bile acid analog and first-in-class agonist of the farnesoid X receptor (FXR), currently being developed in a Phase 3 trial for primary biliary cirrhosis (PBC), as well as Phase 2 trials for several chronic indications including nonalcoholic steatohepatitis (NASH).

45.    Between January 8, 2014 and January 10, 2014, Intercept's stock price jumped from approximately $40 per share to almost $450 per share.

46.    From January 9, 2014, Intercept's stock price has at all times remained significantly in excess of the closing price on January 8, 2014.

<h3 style="text-align:center"><u>Defendant Threatens Intercept</u></h3>

47.    Regretting his decision to sell before Intercept's success in early 2014, recently thereafter Defendant has made unfounded allegations to Intercept that he was a co-inventor of the Intercept-Pellicciari patents.

---

[2]    *See* note 1, *supra*. Defendant was awarded an option to purchase 200,000 shares of Intercept at $1.70 per share, which expired upon the termination of Defendant's consulting arrangement with Intercept. Assuming that this option had not expired and was outstanding as of the date of this filing, Defendant would have been entitled to purchase 34,615 shares of Intercept's common stock at a price of $9.8223 per share.

48.     Although Defendant has provided no evidence to corroborate his alleged co-inventorship of the Intercept-Pellicciari patents, he has continued his false claims as a purported co-inventor.

49.     Defendant's meritless allegations of co-inventorship, which only arose after Intercept's stock price rose dramatically, are a baseless attempt to extract an unmerited payment from Intercept.

**Defendant Has Violated The SRAs, the CAs, and The Termination Agreement**

50.     In addition to his recent threats of inventorship, Defendant has also refused to comply with the terms of the SRAs, the CAs, and the Termination Agreement.

51.     The SRAs and CAs all effect a present assignment of any future interests in intellectual property, expressly including patent rights, to Intercept of any intellectual property developed by Defendant, including the Intercept-Pellicciari-Fiorucci-Pruzanski patents, pursuant to the SRAs and CAs.

52.     Unlike his recent allegations of co-inventorship of the Intercept-Pellicciari patents, Defendant has never challenged Intercept's rightful ownership of the Intercept-Pellicciari patents or Intercept-Pellicciari-Fiorucci-Pruzanski patents through assignment by all named inventors.

53.     Nor has Defendant challenged that Intercept is the rightful owner by assignment of the Intercept-Pellicciari patents, regardless of any issues regarding Defendant's allegations of co-inventorship.

54.     Defendant has nevertheless refused to provide Intercept with signed and executed assignment documents to facilitate Intercept's prosecution of the

Intercept-Pellicciari-Fiorucci-Pruzanski patents and the related applications even though such refusals represent breaches of his obligations under the SRAs and CAs.

55.     Defendant has also violated the terms of the Termination Agreement by publishing papers in the Journal of Medicinal Chemistry on January 4, 2014, August 27, 2014, and September 24, 2014 (the "2014 Journal of Medicinal Chemistry Articles") without first providing Intercept with advance notice of the publications.

56.     Moreover, the ongoing obligations imposed on Defendant by the SRAs and the Termination Agreement require him to give Intercept a "right of first negotiation" to Defendant's rights in the research results embodied in the 2014 Journal of Medicinal Chemistry Articles.

57.     Defendant never provided Intercept with any opportunity to exercise its right of first negotiation to the technology disclosed in the 2014 Journal of Medicinal Chemistry Articles.

## COUNT I: DECLARATION OF NO INVENTORSHIP

58.     Intercept incorporates each of the preceding paragraphs as if fully set forth herein.

59.     Defendant is not an inventor of any of the Intercept-Pellicciari patents.

60.     Defendant cannot establish that he contributed to the conception of any of the claims of the Intercept-Pellicciari patents.

61.     Nor can he substantiate any of his allegations of inventorship of any of the claims of the Intercept-Pellicciari patents with corroborating evidence.

62.     Accordingly, Defendant has no basis for seeking correction of inventorship pursuant to 35 U.S.C. § 256.

63.      Intercept therefore requests a declaration that Defendant is not an inventor of any of the claims of the Intercept-Pellicciari patents.

## COUNT II: BREACH OF THE SRAs AND CAs

64.     Intercept incorporates each of the preceding paragraphs as if fully set forth herein.

65.     The terms of the SRAs between Intercept and Defendant effected a present assignment by Defendant of all future interest in any patent rights arising from the sponsored research.

66.     The terms of the CAs between Intercept and Defendant effected a present assignment by Defendant of all future interest in any patent rights arising from the sponsored research.

67.     Defendant assigned his rights in the Intercept-Pellicciari-Fiorucci-Pruzanski patents to Intercept through the terms of the SRAs and CAs.

68.     Despite Intercept's rightful ownership of the Intercept-Pellicciari-Fiorucci-Pruzanski patents and all related patent applications, Defendant has frustrated  Intercept's prosecution of these patents and applications by refusing to execute formal assignment documents for them.

69.     Defendant's refusal to execute the assignment of the Intercept-Pellicciari-Fiorucci-Pruzanski patents and related patent applications is a breach of terms of the SRAs and CAs.

70.     Intercept therefore requests injunctive relief compelling Defendant to execute assignment documents for the Intercept-Pellicciari-Fiorucci-Pruzanski patents and related applications and/or judgment from the Court effecting the same relief.

71.     Moreover, even though Defendant is not currently or properly named as an inventor of the Intercept-Pellicciari patents, through the terms of the SRAs and CAs he already assigned any interest in those patents that would arise via inventorship to Intercept.

72.     Intercept therefore, in the alternative to Count I (in the event Fiorucci is adjudged to be properly named an inventor on any of the Intercept-Pellicciari patents), seeks injunctive relief compelling Defendant to execute assignment agreements to the Intercept-Pellicciari patents and related applications to Intercept and/or judgment from the Court effecting the same relief.

## COUNT III: BREACH OF THE TERMINATION AGREEMENT

73.     Intercept incorporates each of the preceding paragraphs as if fully set forth herein.

74.     The Termination Agreement required Defendant to provide Intercept with advance notice of any publications arising from research related to the SRAs and CAs.

75.     Defendant never provided Intercept with any advance notice regarding the 2014 Journal of Medicinal Chemistry Articles, thereby prohibiting Intercept from having the opportunity to evaluate the information for patentable subject matter.

76.     Furthermore, the Termination Agreement required Defendant to provide "all reasonable and timely assistance" to Intercept to assist in the prosecution of Intercept's patent rights.

77.     Defendant has nevertheless refused to execute the mandatory assignment agreements regarding the Intercept-Pellicciari-Fiorucci-Pruzanski patents.

78.     Intercept seeks injunctive relief requiring Defendant to cease use of any of Intercept's proprietary materials, to return any such materials that remain in Defendant's possession to Intercept, and to refrain from making any further use of such materials, including the submission of any further publications.

79.     Intercept further seeks monetary damages for Defendant's various breaches of the Termination Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Intercept requests entry of judgment in its favor and against Defendant and prays that the Court:

A.     Enter declaratory judgment that Defendant is not an inventor of any claims in the Intercept-Pellicciari patents under 35 U.S.C. § 256;

B.     Enter a preliminary and permanent injunction that compelling Defendant to execute an assignment of the Intercept-Pellicciari-Fiorucci-Pruzanski patents and all related patent applications under the terms of the SRAs and CAs to Intercept, or judgment from the Court that achieves the same effect;

C.     In the alternative, if such relief becomes ripe for judicial resolution, enter a preliminary or permanent injunction compelling Defendant to execute an assignment of the Intercept-Pellicciari patents and all related patent applications under the terms of the SRAs and CAs to Intercept, or judgment from the Court that achieves the same effect;

D.     Enter judgment compelling Defendant to cease any use of Intercept's proprietary materials, to return immediately any materials in Defendant's possession to Intercept, and to refrain from publishing any information that implicates, in any way, research performed on Intercept's proprietary materials;

E.     Enter judgment compelling Defendant to provide Intercept with a right of first negotiation for any of Defendant's rights in and to technology developments or research discoveries to which it is entitled;

F.     Enter judgment requiring Defendant to pay money damages for his breach of the SRAs, CAs, and Termination Agreement;

G.     Enter judgment finding this case to be exceptional;

H.     Award reasonable attorneys' fees and expenses, filing fees, and costs of suit incurred by Intercept in this action; and

I.     Award such further and other relief as this Court deems proper and just.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Thomas C. Grimm*
Thomas C. Grimm (#1098)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
tgrimm@mnat.com
jtigan@mnat.com

OF COUNSEL:

Ivor Elrifi
COOLEY LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 479-6000

Adam M. Pivovar
COOLEY LLP
1299 Pennsylvania Avenue
Washington, DC 20004
(650) 843-7800

*Attorneys for Plaintiff*
*Intercept Pharmaceuticals, Inc.*

October 15, 2014
8601853